UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BIJAN GHODSTINAT, FRED KORANGY, BAHAR KORANGY,** | |
| Plaintiffs, | Case No. 23-cv-3175 (CRC) |
| v. | |
| **THE ISLAMIC REPUBLIC OF IRAN,** | |
| Defendant. | |

**MEMORANDUM OPINION**
**(Public Version of ECF No. 21)**

Plaintiffs Bijan Ghodstinat, Fred Fraidon Korangy, and Bahar Korangy are Iranian

Americans who allege that they were abducted in Iran by the Iranian Revolutionary Guard Corps

and held in prison or under home confinement for over two years. After escaping, they sued Iran

under the Foreign Sovereign Immunity Act's terrorism exception, 28 U.S.C. § 1605A. Iran did

not appear to defend this suit, and the Clerk entered default against it. Plaintiffs now seek

default judgment. For the reasons given below, the Court will grant plaintiffs' motion and award

them compensatory and punitive damages in the total amount of $85,067,719.

## I.    Findings of Fact and Procedural History

### A. Findings of Fact

The Court makes the following factual findings based on the record evidence submitted

by plaintiffs in support of their motion for default judgment. See 28 U.S.C. § 1608(e). Again,

Iran has chosen not to contest the plaintiffs' evidence.

### 1. Bijan Ghodstinat

In December 2020, Bijan Ghodstinat, an 81-year-old American and Iranian citizen,

traveled to Iran to see his friend Fred Korangy, visit other friends and family, and advocate for

his ownership rights to a 100-hectare tract of land in Iran.  Decl. of Alireza Bijan Ghodstinat ("Ghodstinat Decl.") ¶¶ 4–5.  He was staying at ██████████████ when armed members of the Iranian Revolutionary Guard Corps ("IRGC") banged on the door, ransacked the premises, arrested Ghodstinat, and accused him of spying for Israel.  Id. ¶¶ 7–11.  The IRGC agents forced Ghodstinat into an SUV and drove him to an unmarked building, where he was held in a windowless basement room without a bed or toilet and deprived of food and water.  Id. ¶¶ 13–15.

The next day, Iranian agents moved Ghodstinat to Evin Prison in Tehran, where he was held in solitary confinement in a small basement cell with filthy water and given little to eat or drink.  Id. ¶¶ 20, 22.  Despite having a painful spinal medical condition, Ghodstinat was denied medication and forced to sleep on the floor on top of a dirty carpet infested with viting ants.  Id. ¶¶ 21–22.  The cell also contained electronic equipment that was "always on" and played a "very loud, high-pitched squeal" that eventually caused Ghodstinat hearing loss.  Id. ¶ 23.  Ghodstinat's captors also used LED strips in the cell to emit "a never-ending stream of bright, ever-changing neon colors," even at night.  Id.  The lights and noises made it all but impossible for Ghodstinat to get a full night's sleep.  Ghodstinat lost 25 pounds while held in Evin Prison due to his untreated medical condition, lack of sleep, and emotional stress.  Id. ¶ 32.

Iranian agents took advantage of Ghodstinat's weakened state, routinely dragging him to an interrogation room where they would berate, threaten, and beat him to try to force him to confess to being a spy.  Ghodstinat Decl. ¶¶ 25–32.  The interrogators also made him identify family members and later abducted ███████████████.  Id. ¶ 28.  They also forced him to stand outside ████████████ interrogation room and listen to ███ crying.  Id.

After 47 days in Evin Prison, Ghodstinat was permitted to leave but remained under strict house arrest at ████████████.  Ghodstinat Decl. ¶¶ 33–34.  He was not permitted to leave

the home except in special circumstances, or when the IRGC took him back to Evin Prison at least once a week for further interrogation.  Id. ¶¶ 34–35.

Six months later, Ghodstinat and Fred Korangy were formally charged with spying and brought before Judge Abolqasem Salavati, whom the United States has sanctioned for his cruel treatment of political prisoners.  Ghodstinat Decl. ¶ 36; Decl. of Fred Fraidon Korangy ("Fred Korangy Decl.") ¶ 33; U.S. Dep't of Treasury, <u>Treasury Sanctions Two Judges Who Penalize Iranians for Exercising Freedoms of Expression and Assembly</u> (Dec. 19, 2019), https://perma.cc/JRT5-3UYD.  Ghodstinat and Korangy were then forced to go to Revolutionary Court, "a prison-like government building," where Salavati interrogated, threatened, and mocked the two over their supposed spying.  Ghodstinat Decl. ¶¶ 37–38; Fred Korangy Decl. ¶¶ 34–35.  Salavati eventually pronounced the two men convicted and sentenced them each to ten years at Evin Prison.  Ghodstinat Decl. ¶ 40; Fred Korangy Decl. ¶ 36.  Thanks to a bureaucratic oversight, the sentences were delayed.  Ghodstinat Decl. ¶ 40; Fred Korangy Decl. ¶ 39.  Ghodstinat then managed to escape Iran in January 2023.  Ghodstinat Decl. ¶ 42.

Today, Ghodstinat lives with ███████████.  Ghodstinat Decl. ¶ 44.  He suffers from lasting physical injuries, including hearing loss that requires hearing aids, back pain that required surgery, and severely limited mobility that requires him to use a cane to walk.  Id. ¶ 46.  He was also ████████████████████████████████ ███████  Id. ¶ 43.

*2.  Fred Korangy*

Fred Korangy's story mirrors Ghodstinat's.  Korangy is a 68-year-old U.S. citizen.  Fred Korangy Decl. ¶¶ 1, 3.  In December 2020, Korangy was visiting Iran with his wife Bahar to care for his ailing 93-year-old father.  Id. ¶ 6.  While he and Bahar were visiting a shopping center

near Tehran, members of the IRGC approached and arrested them. Id. ¶¶ 8–11. IRGC officers took them back to their home and then ransacked the place before separating the couple and taking Korangy to an unmarked facility similar to Ghodstinat's and then to Evin Prison the following day. Id. ¶¶ 12–19. There, Korangy, like Ghodstinat, was held in solitary confinement in a windowless cell fitted with noise-making equipment and bright LED lights. Id. ¶¶ 21–22. He was forced to sleep on the ground and given little food. Id. ¶¶ 22, 24. His captors gave him "medicine" that caused him extreme pain and discomfort. Id. ¶ 24. And they routinely interrogated Korangy, screaming at him and threatening him and his family unless he confessed to spying. Id. ¶¶ 25–28.

After 47 days in Evin Prison, Korangy was released and kept under house arrest at his family's home, guarded by plainclothes IRGC officers. Fred Korangy Decl. ¶¶ 30–31. Like Ghodstinat, Korangy was forced to return to Evin Prison every week for six months, where he would be further interrogated, before eventually being forced to endure Salavati's interrogation at the Revolutionary Court. Id. ¶¶ 32–35. Korangy finally escaped Iran in December 2022. Id. ¶¶ 39–40.

Today, Korangy lives in the United States, where he continues to bear the burden of his imprisonment. Fred Korangy Decl. ¶ 42. He rarely leaves the house, ███ ██████████ ████████████, and has difficulty sleeping ██████████████. Id. ████████████████████████████████████████ ████████████████████████ Id. ¶ 43. Physically, Korangy is still struggling to regain the weight he lost in Iran and suffers from back pain and limited mobility. Id. ¶ 44. He also needed medical care for kidney and bladder conditions caused by his poor treatment. Id. Finally, Korangy operated a successful business before his incarceration in Iran,

which generated an annual profit of around $200,000.  Id. ¶ 45.  That business failed, leaving

him without any work.  Id.

    3.  *Bahar Korangy*

Bahar Korangy is a 67-year-old U.S. citizen who, prior to the events of this case, was a

successful pharmacist.  Decl. of Bahar Najd Korangy ("Bahar Korangy Decl.") ¶¶ 1, 3–4.  In late

2020, she joined her husband Fred in Tehran and accompanied him to the shopping center where

IRGC officers arrested them.  Id. ¶¶ 6–9.  When the officers brought the couple back to their

home, they handcuffed her to a female IRGC officer, ███████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████

Korangy was held under house arrest for the rest of her time in Iran.  Bahar Korangy

Decl. ¶ 18.  IRGC officers did not tell her where Fred was, leaving her worried and anxious.  Id.

¶¶ 16–17.  Between December 2020 and February 2021, IRGC officers took her to Evin Prison

at least once each week for full-day interrogations, handcuffing and blindfolding her before

yelling at her and threatening to kill her and Fred for spying.  Id. ¶¶ 19–21.  After Fred's release,

she remained under house arrest, guarded by IRGC officers around the clock.  Id. ¶ 22.  She was

no longer required to go back to Evin Prison, nor did she face Salavati's interrogation.  She

eventually escaped Iran in December 2022, about a week after Fred's escape.  Id. ¶ 26.

Today, Korangy lives in the United States with her husband.  Bahar Korangy Decl. ¶ 27.

Her arrest in Iran continues to weigh heavily on her, as she has been diagnosed with ████

██████████████. Id. ¶ 29. She says that she "used to be a lively, outgoing person," but now finds it "hard to leave the house" and regularly has ████████████████████

████████████████████████████████████████████████████████████

Id. ¶ 30. Finally, before she went to Iran, she had a job offer for $200,000 per year. Id. ¶ 32. That offer expired while she was in Iran. Id.

B. Procedural History

Ghodstinat and the Korangys sued Iran in this Court under the terrorism exception of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A. They attempted to serve Iran via diplomatic channels, but Iran never appeared. See ECF 12; ECF 14. They moved for default, which the Clerk entered. See ECF 15 (July 10, 2024). They then moved for default judgments. That motion is now ripe for the Court's consideration.

II.  **Legal Standard**

Under Federal Rule of Civil Procedure 55(b)(2), the Court may consider entering a default judgment when a party applies for that relief. See Fed. R. Civ. P. 55(b)(2). "[S]trong policies favor resolution of disputes on their merits," and therefore, "[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party." Jackson v. Beech, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe, 432 F.2d 689, 691 (D.C. Cir. 1970)).

Notwithstanding its appropriateness in some circumstances, "entry of a default judgment is not automatic." Braun v. Islamic Republic of Iran, 228 F. Supp. 3d 64, 74 (D.D.C. 2017) (internal citation omitted). Thus, the procedural posture of a default does not relieve a federal court of its "affirmative obligation" to determine whether it has subject matter jurisdiction over

6

the action. <u>James Madison Ltd. by Hecht v. Ludwig</u>, 82 F.3d 1085, 1092 (D.C. Cir. 1996).

Additionally, "a court should satisfy itself that it has personal jurisdiction before entering

judgment against an absent defendant," but "[i]n the absence of an evidentiary hearing, although

plaintiffs retain 'the burden of proving personal jurisdiction, they can satisfy that burden with a

*prima facie* showing.'" <u>Mwani v. bin Laden</u>, 417 F.3d 1, 6–7 (D.C. Cir. 2005) (quoting <u>Edmond</u>

<u>v. U.S. Postal Serv. Gen. Couns.</u>, 949 F.2d 415, 424 (D.C. Cir. 1991)).  In doing so, "they may

rest their argument on their pleadings, bolstered by such affidavits and other written materials as

they can otherwise obtain." <u>Id.</u> at 7.

Finally, when default judgment is sought under the FSIA, a claimant must "establish[ ]

his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e).  "The

Court, therefore, may not simply accept a complaint's unsupported allegations as true . . . but

may rely upon uncontroverted factual allegations that are supported by affidavits." <u>Worley v.</u>

<u>Islamic Republic of Iran</u>, 75 F. Supp. 3d 311, 319 (D.D.C. 2014) (internal quotation marks and

citations omitted).

## III. Analysis

Three issues require the Court's attention: (1) jurisdiction; (2) Iran's liability; and (3) the

type and amount of damages to award.  The Court will take each in turn.

### A. Jurisdiction

The Court has both subject matter jurisdiction over this case and personal jurisdiction

over Iran.

#### 1. Sovereign Immunity

To begin, the Court has jurisdiction over this case because the plaintiffs have

demonstrated that the case falls under the FSIA's terrorism exception, 28 U.S.C. § 1605A.

Foreign states like Iran cannot be sued in United States courts unless the claim falls within an exception to foreign sovereign immunity set forth in the FSIA. Borochov v. Islamic Republic of Iran, 94 F.4th 1053, 1057 (D.C. Cir. 2024). Under the FSIA's terrorism exception, foreign states can be sued where a state official performed an "act of torture." 28 U.S.C. § 1605A(a)(1). That exception has four requirements relevant here. First, the defendant state committed an act of "torture," as defined by the Torture Victim Protection Act. Id. § 1605A(a)(1), (h)(7); see id. § 1350 note (Torture Victim Protection Act of 1991). Second, the foreign state was designated as a state sponsor of terrorism at the time of the alleged torture. Id. § 1605A(a)(2)(A)(i)(I). Third, the plaintiff was a U.S. citizen at the time of the alleged torture. Id. § 1605A(a)(2)(A)(ii)(I). Fourth, the plaintiff afforded the foreign state an opportunity to arbitrate. Id. § 1605A(a)(2)(A)(iii).

This case meets all four requirements. First, the plaintiffs have adequately demonstrated that Iran tortured them. As relevant here, an act is "torture" if it satisfies three requirements. First, the act must be "directed against an individual in the offender's custody or physical control[.]" 28 U.S.C. § 1350 note. Second, the act must "intentionally inflict[]" "severe pain or suffering[.]" Id. Third, the act must be "for such purposes as obtaining . . . information or a confession" from the victim or a third person, "punishing" the victim for something the victim or a third person did or is suspected of doing, or "intimidating or coercing" the victim or a third person. Id.

Begin with Ghodstinat. The IRGC arrested Ghodstinat and held him first in a basement and then in Evin Prison, so he was in Iranian custody or physical control. See Ghodstinat Decl. ¶¶ 10, 16, 20. While holding Ghodstinat, IRGC officers intentionally inflicted severe pain and suffering upon him by keeping him in solitary confinement in a windowless cell infested with

biting ants. Id. ¶¶ 20–21. The officers gave him little food, denied him needed medication, and prevented him from sleeping by playing loud, high-pitched noises and flashing bright neon colors in his cell. Id. ¶¶ 22–23. And they repeatedly interrogated Ghodstinat, screaming at him, threatening physical harm upon him and his family, and beating him. Id. ¶¶ 26–31. Years later, Ghodstinat continues to feel the effects of his treatment in the form of ███████████████ ████████████████ severe hearing damage, and limited mobility. Id. ¶¶ 43–46. He is unable to work due to his physical and mental health. Id. ¶ 47. Finally, the IRGC did all these things to force Ghodstinat to confess to being a spy for Israel and/or the United States. Id. ¶¶ 26, 29, 33, 38. Based on the above facts, the Court has little difficulty finding that Iranian agents tortured Ghodstinat under the meaning of the FSIA.

So too for the Korangys, who suffered abuse similar to that endured by Ghodstinat. Fred Korangy was arrested by IRGC officers, held in Evin Prison in solitary confinement, and interrogated and threatened unless he confessed to being a spy for the United States. Fred Korangy Decl. ¶¶ 9–13, 17, 19, 21–35. Bahar Korangy was also arrested by IRGC officers, ███ ██████████████████. Bahar Korangy Decl. ¶¶ 12–15. She was then held under house arrest and ordered to go to Evin Prison at least once per week from December 2020 to February 2021. Id. ¶ 19. There, she was handcuffed, blindfolded, and harassed by Iranian officers on account of alleged spying. Id. ¶¶ 20–21. Both Korangys also continue to suffer from ███████ ██████████████ and neither has been able to work since then. Fred Korangy Decl. ¶¶ 41– 48; Bahar Korangy Decl. ¶¶ 28–32.

The terrorism exception's remaining requirements are also met. At all relevant times, Iran was a designated state sponsor of terrorism, and all three plaintiffs were U.S. citizens. See U.S. Dep't of State, State Sponsors of Terrorism, https://www.state.gov/state-sponsors-of-

terrorism/ (noting that Iran has been designated as a state sponsor of terrorism since 1984);

Ghodstinat Decl. ¶ 3; Fred Korangy Decl. ¶ 3; Bahar Kornagy Decl. ¶ 3.  Plaintiffs also afforded

Iran a reasonable opportunity to arbitrate this case by including an arbitration offer in their

service documents.  See Notice of Offer to Arbitrate [ECF 2].

       2.  *Personal Jurisdiction*

The Court also has personal jurisdiction over Iran.  Personal jurisdiction over Iran exists

if the Court has original jurisdiction under 28 U.S.C. § 1330(a) and the plaintiffs properly served

Iran under 28 U.S.C. § 1608.  See 28 U.S.C. § 1330(b).

The Court has original jurisdiction because, for the reasons discussed above, Iran is not

immune to this lawsuit.

Plaintiffs also properly served Iran.  Section 1608 offers four options for service on a

foreign state.  Republic of Sudan v. Harrison, 587 U.S. 1, 4–5 (2019).  First, service "in

accordance with any special arrangement for service between the plaintiff and the foreign

state[.]"  28 U.S.C. § 1608(a)(1).  Second, service "in accordance with an applicable

international convention[.]"  28 U.S.C. § 1608(a)(2).  Third, by mailing the service documents to

the foreign state's head of the ministry of foreign affairs.  28 U.S.C. § 1608(a)(3).  Fourth, if

option three does not yield a response within 30 days, the plaintiff may serve the defendant

through official United States diplomatic channels.  28 U.S.C. § 1608(a)(4).  Here, no special

arrangement exists, and no international convention applies.  See Aff. Requesting Foreign

Mailing at 2 [ECF 9].  Plaintiffs also did not receive a response within 30 days after mailing the

materials.  Id.  They then properly served Iran through diplomatic channels.  Certificate of Clerk

at 1 [ECF 12]; Return of Service at 1 [ECF 13].

B. Liability

Next, the Court finds Iran liable for assault, battery, false imprisonment, and intentional infliction of emotional distress under general principles of tort law.

Before proceeding further, the Court must first address what law governs here. Plaintiffs suggest that D.C. law should govern Ghodstinat's claims, while Maryland law should govern the Korangys' claims. Mot. Default Judgment ("Mot.") at 33–34. Plaintiffs are mistaken on both fronts. Plaintiffs sued under the terrorism exception's cause of action, Section 1605A(c). See Compl. ¶ 123. When plaintiffs proceed under that cause of action, courts apply not a specific state's law but more general, "'well-established principles of law, such as those found in Restatement (Second) of Torts' to determine liability under the FSIA." Abedini v. Gov't of Islamic Republic of Iran, 422 F. Supp. 3d 118, 132 (D.D.C. 2019) (quoting In re Islamic Republic of Iran Terrorism Litig., 659 F. Supp. 2d 31, 61 (D.D.C. 2009)); cf. Bettis v. Islamic Republic of Iran, 315 F.3d 325, 333 (D.C. Cir. 2003) (relying on Restatement (Second) of Torts when analyzing liability under earlier version of the terrorism exception). The Court will therefore apply well-established principles of tort law to plaintiffs' four claims: assault, battery, false imprisonment, and intentional infliction of emotional distress.

Begin with assault. A defendant is liable for assault when the defendant (1) "acts intending to cause a harmful or offensive contact" with another "or an imminent apprehension of such a contact," and (2) the other person "is thereby put in such imminent apprehension." Stansell v. Republic of Cuba, 217 F. Supp. 3d 320, 343 (D.D.C. 2016) (quoting Restatement (Second) of Torts § 21 (A.L.I. 1965)). Both elements are met here. Torture by design "subject[s] the victim to 'imminent apprehension of harmful or offensive contact' at all times while in captivity." Abedini, 422 F. Supp. 3d at 132 (quoting Sutherland v. Islamic Republic of

11

Iran, 151 F. Supp. 2d 27, 48 (D.D.C. 2001)). Given the Court's prior finding that plaintiffs were tortured by Iran, the Court has little trouble finding that Iran is liable for assault.

Second, battery. Battery shares assault's intent requirement but also requires that "a harmful contact with the [other] person . . . directly or indirectly result[]" from the perpetrator's acts. Stansell, 217 F. Supp. 3d at 342 (quoting Restatement (Second) of Torts § 13). Here, the plaintiffs all suffered harmful contacts from Iranian guards. Ghodstinat and Fred Korangy were manhandled by IRGC members when they were arrested and while being held in Iranian custody. Ghodstinat Decl. ¶¶ 10, 16, 19, 31 37; Fred Korangy Decl. ¶¶ 11–13, 19. ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Bahar Korangy Decl. ¶¶ 12–15. Iran is therefore liable for battery as well.

Third, a defendant is liable for false imprisonment when (1) the defendant "acts intending to confine the other," (2) the defendant's "act directly or indirectly results in such a confinement of the other," and (3) "the other is conscious of the confinement or is harmed by it." Stansell, 217 F. Supp. 3d at 342–43 (quoting Restatement (Second) of Torts § 35). Here, Iranian agents arrested all three plaintiffs and confined them in unmarked facilities, Evin Prison, and in homes under house arrest. Ghodstinat Decl. ¶¶ 10, 14, 18, 34; Fred Korangy Decl. ¶¶ 10, 17, 21, 31; Bahar Korangy Decl. ¶¶ 9, 18–19, 22. These acts plainly constitute false imprisonment.

Fourth, "[a] defendant is liable for intentional infliction of emotional distress when he, 'by extreme and outrageous conduct[,] intentionally or recklessly causes severe emotional distress to' the plaintiff." Stansell, 217 F. Supp. 3d at 343 (alteration in original) (quoting Restatement (Second) of Torts § 46). "Torture, by definition, involves 'extreme and outrageous' conduct[.]" Abedini, 422 F. Supp. 3d at 133 (quoting Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 91–92 (D.C. Cir. 2002)). So in light of Iran's torturing of plaintiffs and

the resulting emotional and mental trauma plaintiffs suffered, the Court finds that Iran is also liable for intentional infliction of emotional distress.

C. Damages

That brings the Court to damages. Four types of damages are available to plaintiffs under the FSIA: (1) pain and suffering; (2) economic damages; (3) solatium; and (4) punitive damages. See 28 U.S.C. § 1605A(c)(4). Plaintiffs must "prove the amount of damages by a reasonable estimate." Abedini, 422 F. Supp. 3d at 136 (quoting Moradi v. Islamic Republic of Iran, 77 F. Supp. 3d 57, 69 (D.D.C. 2015)). In determining how much to award each plaintiff, the Court's "primary consideration . . . is to ensure that 'individuals with similar injuries receive similar awards.'" Hekmati v. Islamic Republic of Iran, 278 F. Supp. 3d 145, 163 (D.D.C. 2017) (quoting Moradi, 77 F. Supp. 3d at 70).

The Court will begin with each plaintiff's individual compensatory award before addressing punitive damages.

1. *Ghodstinat*

Ghodstinat seeks pain and suffering damages and economic damages. The Court will award Ghodstinat $6,992,944 in pain and suffering damages and $0 in economic damages.

a. Pain and Suffering

Damages for pain and suffering in terrorism cases are hard to determine. "[T]here is no market where pain and suffering are bought and sold, nor any standard by which compensation for it can be definitely ascertained, or the amount actually endured can be determined." Weinstein v. Islamic Republic of Iran, 184 F. Supp. 2d 13, 22 (D.D.C. 2002) (quoting St. Louis Sw. Ry. Co. v. Kendall, 169 S.W. 822, 824 (Ark. 1914)). And no one—including the Court—is capable of fully understanding everything that Ghodstinat and the Korangys endured.

Ghodstinat was detained in Iran for 748 days, measured from the day of his abduction to the day

of escape (December 18, 2020, to January 5, 2023).  Ghodstinat Decl. ¶¶ 6, 42.  During that time,

he was held in an unmarked IRGC facility, Evin Prison, and at home under house arrest, all the

while being interrogated by Iranian officials, before eventually being convicted in a sham trial.

Id. ¶¶ 14–40.  These events caused him ███████████████████████████████

███████████████████████████████. Id. ¶ 43; Mot. Ex. 15 at 1.  And on the

physical side of things, Ghodstinat's prolonged detainment caused permanent hearing loss such

that his family "has to shout so [he] can hear them."  Ghodstinat Decl. ¶ 46; Mot. Ex. 11 at 1–2.

His confinement also worsened his back condition, requiring surgery and limiting his mobility so

as to make "many routine household chores . . . simply impossible[.]"  Ghodstinat Decl. ¶ 46;

Mot. Exs. 17, 18.

     In cases involving prolonged confinement like this one, many courts have approximated

damages "on a per diem basis—awarding $10,000 per day held in captivity."  Wyatt v. Syrian

Arab Republic, 908 F. Supp. 2d 216, 231 (D.D.C. 2012) (citing Price v. Socialist People's

Libyan Arab Jamahiriya, 384 F. Supp. 2d 120, 134–35 (D.D.C. 2012)).  Congress has "tacitly

approved" this formula.  Sutherland v. Islamic Republic of Iran, 151 F. Supp. 2d 27, 51 (D.D.C.

2001).  Courts will then adjust the per-diem amount to account for particularly severe

mistreatment or injuries and any harm that lingers to the present day.  E.g., Wyatt, 908 F. Supp.

2d at 231–32; Cronin v. Islamic Republic of Iran, 238 F. Supp. 2d 222, 234–35 (D.D.C. 2002).

     The Court, like others in this district, will also use this per diem approach, but with some

modifications.  Under the default $10,000 per day rate, Ghodstinat's 748 days in captivity would

yield an award of $7.48 million.  Surely all 748 days were difficult.  But the Court does not

believe it appropriate to apply the $10,000 rate across the board.  Courts ordinarily apply that

$10,000 rate in cases where the victim was held entirely, or at least mostly, in Iranian prisons.

See, e.g., Abedini, 422 F. Supp. 3d at 127, 136–37 (applying $10,000 rate for three years'

imprisonment); Hekmati, 278 F. Supp. 3d at 154, 163–64 (1,602 days of imprisonment). Here,

by contrast, Ghodstinat was held for 47 days in Evin Prison, leaving 701 days under house arrest.

Ghodstinat Decl. ¶ 33.

   It would not be fair to equate Ghodstinat's time under house arrest to other victims' time

in prison. House arrest is much less grueling than imprisonment. Ghodstinat was held in solitary

confinement in prison, fed very little, deprived of basic sanitation, and forced to sleep on an ant-

infested carpet while a speaker played high-pitched noises and bright lights flashed at him.

Others held in Iranian prisons had similar experiences. See, e.g., Abedini, 422 F. Supp. 3d at

127. Ghodstinat's declaration, however, says very little about ███████████, where he was

confined, likely because the home's conditions were much better than Evin's. Furthermore,

Ghodstinat was interrogated "almost every day" while in Evin, compared to once a week while

under house arrest. Ghodstinat Decl. ¶¶ 25, 35, 37. At the same time, house arrest was not

exactly pleasant for Ghodstinat. He was still interrogated all day once a week, which works out

to about 70 days of interrogation while on house arrest across some 700 days of house arrest.

See Ghodstinat Decl. ¶¶ 35, 37; Rough Oral Arg. Tr. at 5. Ghodstinat was also forbidden from

leaving ███████████ and lived under the constant fear that he would be convicted of

spying in a sham proceeding by a brutal regime. Id. ¶ 34. Balancing the significant

improvement in Ghodstinat's conditions against the toll of his house arrest, the Court finds that a

per diem rate of $3,500 per day of house arrest is appropriate. The Court will, however, treat the

70 days of interrogation as days of incarceration for the purposes of the per diem calculation,

yielding a total of 117 days of incarceration and 631 days of house arrest.

On the other side of the coin, the Court will double the per diem rate for the time Ghodstinat was held in Evin Prison. Courts have sometimes increased damages awards where they find that the per diem calculation would not adequately compensate the victim. See, e.g., Wyatt, 908 F. Supp. 2d at 231–32. Here, the $10,000 per diem rate does not adequately account for the fact that Ghodstinat is an 82-year-old man who was in his late 70s when he was held in Evin Prison. Ghodstinat Decl. ¶¶ 1, 6, 16. Most cases have applied that rate to compensate plaintiffs who were decades younger than Ghodstinat. See, e.g., Abedini, 422 F. Supp. 3d at 136–37 (plaintiff was 35 at release); Hekmati, 278 F. Supp. 3d at 163–64 (32 at release). The treatment Ghodstinat endured would have taken a much greater physical and emotional toll on him than it would on those younger plaintiffs. The Court therefore will apply a $20,000 per diem rate for Ghodstinat's time incarcerated.

Using the per diem approach as modified above, the Court will award $4,548,500 to compensate Ghodstinat for the pain and suffering he experienced while incarcerated or under house arrest.

The Court will award Ghodstinat a further $2,444,444 for post-release pain and suffering. The Court has arrived at this figure using the baseline set in Hekmati v. Iran, 278 F. Supp. 3d 145 (D.D.C. 2017). There, the plaintiff, like Ghodstinat, was incarcerated and interrogated by Iranian agents before eventually being convicted of spying. Id. at 150–54. The plaintiff attested to serious injuries and lasting psychological trauma. See id. at 154–55, 164. The district court awarded $10 million for post-release pain and suffering, considering the severity of the plaintiff's suffering and the plaintiff's 45-year life expectancy of at the time of release. Id. at 164. Other district courts have subsequently used Hekmati as a baseline. For example, in one case, the plaintiff, like Ghodstinat, ███████████████████████████ following his

16

release from captivity. <u>Abedini</u>, 422 F. Supp. 3d at 133. The district court, noting the similarity between that plaintiff and the plaintiff in <u>Hekmati</u>, prorated the $10 million figure to account for differences in life expectancy. <u>Id.</u> at 137. Other courts have taken similar approaches for similar lasting injuries. <u>See, e.g.</u>, <u>Azadeh v. Islamic Republic of Iran</u>, No. 16-cv-1467 (KBJ), 2018 WL 4232913, at *20 (D.D.C. Sept. 5, 2018).

Now to apply the <u>Hekmati</u> baseline to this case. At the time of his release, Ghodstinat was 79 or 80. <u>See</u> Ghodstinat Decl. ¶¶ 1,42. According to the Centers for Disease Control, a non-Hispanic Asian male in that age range has a life expectancy of around eleven years. Elizabeth Arias, Jiaquan Xu & Kenneth Kochanek, <u>United States Life Tables 2022</u> ("Life Tables"), 74 Nat'l Vital Stats. Reps., no. 2, at 35 (Apr. 8, 2025). Prorating from <u>Hekmati</u>'s $10,000,000 baseline for a life expectancy of 45 years yields a post-release pain and suffering award of approximately $2,444,444. The Court finds that amount appropriately compensates Ghodstinat for his post-release pain and suffering.

At oral argument, plaintiffs' counsel correctly noted that some of these benchmark rates were set many years ago and argued that the rates should be adjusted for inflation. Rough Oral Arg. Tr. 5–6. The Court sympathizes with plaintiffs, but it will not adjust these awards for inflation because doing so would not be fair to other victims. Victims of terrorist attacks in suits like these are compensated from a limited fund set up by Congress. <u>Force v. Islamic Republic of Iran</u>, 610 F. Supp. 3d 216, 224 (D.D.C. 2022). That fund, however, is not nearly large enough to compensate all claimants, leading to most being paid pennies on the dollar on a pro rata basis. <u>Id.</u> As a result, awarding these plaintiffs more in damages reduces the amount available to other victims. That would not be a problem if other courts adjusted their awards for inflation. But they have not done so. <u>See, e.g.</u>, <u>Abedini</u>, 422 F. Supp. 3d at 137 (applying $10,000 per diem

rate).  As such, increasing plaintiffs' award to account for inflation would come at a cost to most, if not all, other plaintiffs.  (And conversely, if all plaintiffs' awards were adjusted, then no one would benefit.)

Finally, plaintiffs also requested additional pain and suffering damages, which another court in this district awarded in Azadeh v. Islamic Republic of Iran, No. 16-cv-1467 (KBJ), 2018 WL 4232913 (D.D.C. Sept. 5, 2018).  In that case, the plaintiff was held in Evin Prison for 114 days.  Id. at *18.  For those days, the court applied the $10,000 per diem formula.  Id.  The Court also awarded additional damages because Iranian officers subjected plaintiff to two mock executions.  Id.  During those executions, the Iranian officers lined the plaintiff up in front of a firing squad and ordered the squad to shoot.  Id.  Only after the plaintiff fainted did she realize that the guns were in fact loaded with blanks.  Id.  The court awarded a total of $4.14 million for pain and suffering while incarcerated.  Id. at *19.

Azadeh does not support awarding additional damages to Ghodstinat.  If anything, it further confirms the Court's award here.  While Ghodstinat was subjected to brutal treatment, no one thing he endured can be fairly compared to the mock executions in Azadeh.  On the other hand, Ghodstinat was held for much longer than the plaintiff in Azadeh was.  So it seems fair to award Ghodstinat a similar amount for pain and suffering while incarcerated—about $4.6 million for Ghodstinat, compared to about $4.1 million in Azadeh.  But a further increase Ghodstinat's award is not warranted.

In total, the Court awards Ghodstinat $6,992,944 for pain and suffering.

b.  Economic Damages

Economic damages "typically include lost wages, benefits and retirement pay, and other out-of-pocket expenses."  Owens v. Republic of Sudan, 71 F. Supp. 3d 252, 258 (D.D.C. 2014).

Here, the only economic damages Ghodstinat seeks are for a 100-hectare plot of land in Mashhad, Iran. See Mot. at 49; Ghodstinat Decl. ¶ 49. Ghodstinat claims that he has a possessory interest in that land valued at about $115 million. Ghodstinat Decl. ¶ 49; Mot. Ex. 19 at 4. He claims that Iran detained him because he had been advocating for his right to that land. Ghodstinat Decl. ¶ 51.

The Court declines to award damages for this land for three reasons. First, Ghodstinat's claim for these damages is essentially an expropriation claim. Ghodstinat's complaint, however, raises a single claim against Iran under the FSIA's terrorism exception. See Compl. ¶¶ 122–44. That exception does not waive sovereign immunity for expropriation. See 28 U.S.C. § 1605A. To bring such a claim, Ghodstinat had to sue under the FSIA's non-terrorism waiver for expropriation, 28 U.S.C. § 1605(a)(3). The Court will not permit Ghodstinat to amend his complaint to include such a claim at this stage, for "[i]t is well settled that a party cannot amend [its] complaint through motions briefing." Sinha v. Blinken, No. 20-cv-2814 (DLF), 2021 WL 4476749, at *3 (D.D.C. Sept. 30, 2021) (citing Durand v. District of Columbia, 38 F. Supp. 3d 119, 129 (D.D.C. 2014)).

Second, and in any event, Ghodstinat has not adequately explained why these damages are "economic." They do not fit into any of the usual buckets of economic damages: "lost wages, benefits and retirement pay, and other out-of-pocket expenses." Owens, 71 F. Supp. 3d at 258. Ghodstinat cites no cases in which courts permitted torture victims to recover the cash value of a land interest when an alleged purpose of the torture was to deprive the victim of that interest.

Third, Ghodstinat has not adequately demonstrated that he has lost the value of this land. In fact, Ghodstinat convinced an Iranian judge in 2014 to recognize his interest in the land.

Ghodstinat Decl. ¶ 50. He has not provided sufficient evidence to prove that he has now lost that judicially recognized stake. For example, he has not produced evidence showing that he cannot recuperate the value of the land by selling it, either directly from the United States or via an agent in Iran.

The Court therefore will not award Ghodstinat any economic damages.

### 2. Fred Korangy

Fred Korangy seeks damages for pain and suffering, economic loss, and loss of solatium. The Court will award $8,351,944 for pain and suffering, $1,328,949 for economic loss, and $1,000,000 for loss of solatium.

#### a. Pain and Suffering

The Court will employ the same general framework for Korangy as sketched out above for Ghodstinat. Korangy was held for a total of 732 days, of which 117 were spent in Evin Prison or being interrogated while on house arrest. Fred Korangy Decl. ¶¶ 8, 30. 40. He was 68 years old as of October 2024, meaning he was 66 or 67 when released, and had a life expectancy of around twenty years at that time. Id. ¶¶ 1, 40; Life Tables at 35. ███████████ ███████████████████████ Fred Korangy Decl. ¶ 42. Given that Korangy is over ten years younger than Ghodstinat, the Court will increase the per diem rate for his time in Evin Prison by 50%, to $15,000, rather than double it as it did for Ghodstinat. And because of the similarities between Korangy and Ghodstinat's conditions of home confinement, the Court finds that a $3,500 per diem rate for house arrest is also appropriate.

The above yields a pain and suffering award of $8,351,944, of which $3,907,500 is for pain and suffering while incarcerated or under house arrest and $4,444,444 is for post-release lingering harm.

b. Economic Damages

The Court will award Korangy $1,328,949 in economic damages. Korangy claims three types of economic damages: (1) loss of a property interest in Iranian land; (2) lost wages; and (3) other economic harms. Mot. at 51–54.

First, the Court declines to award Korangy damages for his land interests for the reasons explained above.

Second, the Court awards Korangy's requested amount of $1,328,949 in lost wages. This request is based on Korangy's estimate that he earned roughly $200,000 per year from his business prior to his detention in Iran. Fred Korangy Decl. ¶ 45. According to an economic expert, if he had continued working until the typical retirement age for professionals of 75, he would have earned $1,328,949, accounting for taxes and expected growth. See Mot. Ex. 33. That estimate seems reasonable to the Court, and it accordingly finds that Korangy has adequately proven his lost wages by a reasonable estimate.

Third, Korangy seeks damages for "other economic harms" that he concedes are "impossible to distill into exact dollar figures." Mot. at 53. These harms include reductions to his credit score from seeking debt forgiveness for credit cards that went into default while he was held in Iran. Id.; Fred Korangy Decl. ¶ 46. Because Korangy offers no means of quantifying these harms, he has not proven their amount by a reasonable estimate. The Court therefore declines to award damages for these other harms.

c. Loss of Solatium

The typical framework for solatium damages for family members of a victim that survived a terrorist attack is as follows: "$4 million, $2.5 million and $1.25 million to spouses, parents, and siblings, respectively, and $1.5 million for children." Cohen v. Islamic Republic of

<u>Iran</u>, 268 F. Supp. 3d 19, 26 (D.D.C. 2017) (quoting <u>Kaplan v. Hezbollah</u>, 213 F. Supp. 3d 27, 38 (D.D.C. 2016)). "Courts similarly have held that relatives of surviving victims presenting with emotional trauma and no physical injury receive amounts proportionally less than those with physical injuries, namely, $1 million for spouses; $850,000 for parents; $750,000 for children, and $500,000 for siblings." <u>Id.</u>

Here, the Court will award $1 million in solatium damages. Bahar Korangy survived her mistreatment at Iran's hands and suffered ████████████████████. But she does not identify any lasting physical injuries from her captivity. <u>See</u> Bahar Korangy Decl. ¶¶ 26–32. Accordingly, the Court finds that, in keeping with awards in other cases, $1 million in solatium damages is appropriate for Fred Korangy.

### 3. *Bahar Korangy*

Bahar Korangy also seeks damages for pain and suffering, economic loss, and loss of solatium. The Court will award $6,851,111 for pain and suffering, $1,830,958 for economic loss, and $2,000,000 for loss of solatium.

### a. Pain and Suffering

The Court will again employ the same general framework sketched out above to determine Bahar Korangy's pain and suffering award. Korangy was held under house arrest for 740 days. Bahar Korangy Decl. ¶¶ 7, 26. She was 67 years old as of October 2024, meaning she was 65 or 66 when she escaped and had a life expectancy of around 23 years at the time. <u>Id.</u> ¶¶ 1, 26; <u>Life Tables</u> at 37.

The Court will apply a $1,000 per diem rate for Korangy's house arrest. Korangy's declaration does not state that she was required to appear before Judge Salavati, and it appears that her interrogations ceased after her husband was released from Evin. <u>See</u> Bahar Korangy

Decl. ¶ 23 (attesting that Fred Korangy was required to submit to further interrogation but saying nothing about any continued interrogations for her). Accordingly, Bahar Korangy appears to have been interrogated for a much shorter period than Ghodstinat and Fred Korangy were. The Court therefore finds that a further reduction in the per diem rate is warranted.

This yields an award of $740,000 for pain and suffering while under house arrest and $5,111,111 for post-release lingering harm. The Court will add a further $1,000,000 to Bahar Korangy's award so as to compensate her ███████████████████, bringing her total pain and suffering award to $6,851,111.

### b. Economic Damages

The Court awards Korangy's requested $1,830,958 in lost wages. This request is based on the fact that Korangy had a job offer as pharmacist prior to her detention in Iran that would have paid her $200,000 per year. Bahar Korangy Decl. ¶ 32. According to an economic expert, if Korangy had continued working until the typical retirement age for professionals of 75, she would have earned $1,830,958 accounting for taxes and expected salary growth. See Mot. Ex. 35. That estimate seems reasonable to the Court, and it accordingly finds that Korangy has adequately proven her lost wages by a reasonable estimate.

### c. Loss of Solatium

The Court finds that an award of $2 million for loss of solatium is appropriate. As a reminder, the default solatium framework awards $4 million to the spouse of a victim who survived a terrorist attack with physical and emotional trauma and $1 million to the spouse of a victim with emotional trauma but no physical injuries. See Cohen, 268 F. Supp. 3d at 26. Here, Fred Korangy ██████████████████████. Fred Korangy Decl. ¶ 42. But his physical injuries are comparatively light when compared to other terrorism victims. He

attests to lingering pack pain and difficulty regaining lost weight, both of which are undoubtedly serious and make life much more difficult. Id. ¶ 44. He also alludes to kidney and bladder conditions for which he received treatment, though it is unclear if those conditions are still being felt today. See id. (The Korangys did not submit any additional medical records documenting the extent of any physical injuries.) In comparison, many other victims in these types of cases suffered far more grave injuries, including one plaintiff whose treatment by his Iranian captors left him "impotent" and unable to walk. Reed v. Islamic Republic of Iran, 845 F. Supp. 2d 204, 208 (D.D.C. 2012). In light of Fred Korangy's serious, though comparatively minor lasting physical injuries, the Court will award $2 million to Bahar Korangy for loss of solatium.

### 4.  Punitive Damages

Finally, all three plaintiffs seek punitive damages in addition to their individual compensatory awards. The FSIA authorizes punitive damages to be assessed against foreign state sponsors of terrorism. 28 U.S.C. § 1605A(c). "Courts calculate punitive damages by considering the following four factors: '(l) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants.'" Cohen, 268 F. Supp. 3d at 27 (quoting Wamai v. Republic of Sudan, 60 F. Supp. 3d 84, 96–97 (D.D.C. 2014)). Here, all four factors point in favor of awarding punitive damages. "[H]ostage taking and torture are the quintessential embodiment of outrageousness," and causes "substantial and permanent" harm to its victims. Abedini, 422 F. Supp. 3d at 141 (cleaned up). Iran's actions are also "part of a longstanding pattern and policy, making the need for deterrence clear." Id. (quoting Hekmati, 278 F. Supp. 3d at 166). "Finally, 'Iran is a sovereign and has substantial wealth.'" Hekmati, 278 F. Supp. 3d at 166 (quoting Bluth v. Islamic Republic of Iran, 203 F. Supp. 3d 1, 25 (D.D.C. 2016)).

The question then is how to calculate punitive damages. Plaintiffs propose a multiplier of two, meaning that the Court would award double the compensatory award as punitive damages. The Court agrees and concludes such a multiplier is appropriate, as it has in other cases against Iran. See Cohen, 268 F. Supp. 3d at 27–28.

The Court therefore will award $56,711,812 as punitive damages, to be apportioned among the plaintiffs according to their individual compensatory awards.

## IV. Conclusion

For these reasons, the Court grants plaintiffs' motion for default judgment and awards damages as follows:

| Plaintiff | Compensatory Damages | Punitive Damages |
|---|---|---|
| Bijan Ghodstinat | $6,992,944 | $13,985,888 |
| Fred Korangy | $10,680,893 | $21,361,786 |
| Bahar Korangy | $10,682,069 | $21,364,138 |

A separate Order follows.

_____

CHRISTOPHER R. COOPER
United States District Judge

Date: August 5, 2025